**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| DIANNA ZEILIK, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GAINWELL TECHNOLOGIES, LLC,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Dianna Zeilik ("Plaintiff") brings this Class Action Complaint against Gainwell Technologies, LLC ("Defendant"), individually and on behalf of all others similarly situated ("Class Members"), and alleges, upon personal knowledge as to her own actions and her counsels' investigations, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1. This class action arises from a security breach that Defendant detected on or around June 25, 2026, which allowed cybercriminals to access Defendant's computer network and exfiltrate files containing the personally identifiable information ("PII") and protected health information ("PHI", collectively with PII, the "Private Information") of Plaintiff and Class Members (the "Data Breach" or "Breach"). As a direct result, Plaintiff and Class Members have suffered damages, including the imminent, ongoing threat of further harm from the criminal misuse of their stolen Private Information.

2. Defendant Gainwell Technologies, LLC is a Texas-based company that provides fiscal agent and account administration services for government agencies and healthcare

organizations around the country.[1] The entities Defendant provides its services to are hereinafter referred to as "Defendant's Clients" or "Clients".

3. Defendant provides its services to the Connecticut Medicaid program, known as HUSKY Health, which is administered by the Connecticut Department of Social Services ("DSS").

4. Defendant also operates a provider web portal for the Connecticut Medicaid Program. In that capacity, Defendant collects and maintains Medicaid members' Private Information.

5. On or around June 25, 2026, Defendant became aware that an unauthorized individual gained access to a hospital provider's reimbursement account on the HUSKY provider portal that Defendant operates. Subsequent investigations determined that cybercriminals accessed and acquired files containing at least the following categories of sensitive Private Information belonging to Plaintiff and Class Members on June 18, 2026: full names, identification numbers associated with provider health care accounts or Medicaid claims, dates of medical services, information about services received and how they were billed, payment information, including amounts paid, and information about applicable non-Medicaid health insurance, including policy and group numbers.

6. On or around August 21, 2026, Defendant began sending Notice of Data Incident letters to individuals affected by the Data Breach, informing them that their Private Information had been exfiltrated in the Data Breach ("Notice Letter"). Plaintiff received a Notice Letter dated August 21, 2026, informing her that her Private Information was accessed and obtained by an unauthorized third party in the Data Breach.

[1] https://www.gainwelltechnologies.com/who-we-are/( last visited Sept. 4, 2026)

7. Because Defendant collected, maintained, and handled Plaintiff's and Class Members' Private Information, it had a duty and obligation to safeguard that information and prevent unauthorized third parties from accessing it.

8. Ultimately, Defendant failed to fulfill this obligation, as an unauthorized actor accessed the HUSKY provider portal and downloaded documents containing certain Private Information belonging to Plaintiff and Class Members. The Data Breach—and the successful exfiltration of Private Information—were the direct, proximate, and foreseeable results of multiple failings on the part of Defendant.

9. The Data Breach occurred because Defendant failed to implement reasonable security protections to safeguard the provider portal and the Private Information it maintained. Moreover, before the Data Breach occurred, Defendant failed to inform Plaintiff and Class Members that its data security practices were deficient and inadequate. Had Plaintiff and Class Members been made aware of this fact, they would not have never provided such information to Defendant or Defendant's Clients who in turn provided the Private Information to Defendant,

10. Accordingly, Plaintiff brings this action individually and on behalf of all those similarly situated to seek relief for the consequences of Defendant's failure to reasonably safeguard Plaintiff's and Class Members' Private Information.

11. Upon information and belief, Plaintiff's Private Information is available on the dark web as a result of the Data Breach.

12. The fact that an unauthorized actor removed the Private Information means that the data was not merely accessed or viewed but was affirmatively exfiltrated from Defendant's systems. This exfiltration dramatically increases the risk that the data has been, or will be, used for medical identity theft, fraudulent insurance claims, billing fraud, phishing, social engineering, and

other malicious purposes. Once downloaded by an unauthorized individual, there is no mechanism to retrieve, recall, or reverse the disclosure.

13. Despite the highly sensitive nature of the Private Information it collected, maintained, and stored, and despite its obligations under federal and state law, Defendant failed to implement and maintain reasonable and adequate data security measures sufficient to protect Plaintiff's and Class Members' Private Information from the foreseeable risk of unauthorized access and exfiltration.

14. As a result of Defendant's negligent, reckless, intentional, and/or unconscionable failure to adequately satisfy its contractual, statutory, and common-law obligations, Plaintiff and Class Members suffered and will suffer injuries, including but not limited to:

a. Theft of their Private Information;

b. Lost or diminished value of their Private Information;

c. Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, medical identity theft, fraud, and/or unauthorized use of their Private Information;

d. Lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to the loss of time needed to take appropriate measures to avoid unauthorized claims, insurance activity, and other fraud;

e. Time needed to investigate, correct and resolve unauthorized access to their accounts; time needed to deal with spam messages and e-mails received subsequent to the Data Breach; and

f. The continued and increased risk of compromise to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their Private Information.

15. Plaintiff brings this action to hold Defendant accountable and to obtain damages and other appropriate relief including, among other relief, relief sufficient to address the costs of adequate credit monitoring and identity theft protection services to Plaintiff and Class Members.

## THE PARTIES

16. Plaintiff is a citizen and resident of New Haven, Connecticut.

17. Defendant Gainwell Technologies, LLC is a Texas limited liability company with its principal place of business at 225 E John Carpenter Fwy Ste 500, Irving, TX 75062 - 2326.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because: (a) the proposed Class consists of more than 100 members; (b) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (c) at least one Class Member is a citizen of a state different from Defendant, namely, Plaintiff, a citizen of Connecticut.

19. For purposes of assessing diversity under CAFA, an unincorporated association—including a limited liability company—is deemed a citizen of the state under whose laws it is organized and the state where it maintains its principal place of business. 28 U.S.C. § 1332(d)(10). Defendant is organized under the laws of Texas and maintains its principal place of business at 225 E John Carpenter Fwy Ste 500, Irving, TX 75062 - 2326. Accordingly, Defendant is a citizen of Texas for CAFA purposes, and minimal diversity exists because Plaintiff is a citizen of Connecticut, a state different from Defendant.

20. This Court has personal jurisdiction over Defendant because Defendant maintains its headquarters and principal place of business within this District. Defendant conducts substantial business in this District, including operation of the HUSKY provider portal, and the claims arise from Defendant's conduct directed at and emanating from this District.

21. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this District, and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the acts, events, and/or omissions giving rise to Plaintiff's claims occurred in this District,

including Defendant's operation of the HUSKY provider portal and maintenance and storage of Plaintiff's and Class Members' Private Information through systems operated from this District.

## COMMON FACTUAL ALLEGATIONS

### A. Defendant's Collection and Storage of Private Information.

22. Defendant is a Texas-based company that provides fiscal agent and account administration services for its Clients, including the Connecticut Medicaid program, known as HUSKY Health, which is administered by DSS. Defendant also operates the HUSKY provider portal.

23. In connection with those services, Defendant collects, maintains, and stores large volumes of Private Information belonging to Plaintiff and Class Members.

24. By collecting, storing, and maintaining the Private Information of Plaintiff and Class Members, Defendant owed a duty to Plaintiff and Class Members to protect and safeguard their Private Information from unauthorized disclosures.

25. Upon information and belief, Defendant failed to implement necessary data security safeguards at the time of the Data Breach. This failure resulted in cybercriminals accessing Plaintiff's and Class Members' Private Information through the provider portal.

26. Plaintiff and Class Members indirectly provided their Private Information to Defendant. Plaintiff and Class Members had a reasonable expectation that Defendant, acting as fiscal agent, account administrator, and portal operator, would keep that sensitive Private Information confidential and secure from unauthorized access.

27. Upon information and belief, and through its Privacy Policy, Defendant made promises and representations to individuals, including Plaintiff and Class Members, that the

Private Information collected from them would be maintained and used only for necessary business activities.[2]

28. This expectation was objectively reasonable and based on an obligation imposed on Defendant by statute, regulations, industry custom, and standards of general due care.

29. Unfortunately for Plaintiff and Class Members, Defendant failed to carry out its duty to safeguard sensitive Private Information and provide adequate data security. As a result, it failed to protect Plaintiff and Class Members from having their Private Information accessed and stolen during the Data Breach.

**B. The Data Breach.**

30. On or around August 21, 2026, Defendant began sending Notice of Data Incident letters to individuals affected by the Data Breach.[3] Plaintiff received a Notice Letter informing her that her Private Information was accessed and obtained by an unauthorized third party in the Data Breach. The Notice Letter states:

> **What Happened**
>
> On June 25, 2026, we became aware that an unauthorized individual gained access to a hospital provider's reimbursement account on the HUSKY provider portal.
>
> The unauthorized individual first gained access to the provider portal on June 18, 2026, and attempted to obtain payments intended for that provider. We do not believe the individual was trying to access patient data. However, while attempting

[2] Privacy Policy, available at https://www.gainwelltechnologies.com/privacy-policy/ ("However, we note that where we are acting in the capacity of a data processor or service provider on behalf of our business customers we only process your personal data to the extent, and in such a manner, as is necessary for the business purposes in accordance with our business customer's written instructions (including any applicable privacy notices provided by our business customers). We will not process your personal data for any other purpose or in a way that does not comply with our business customer's written instructions or the applicable data protection laws and regulations."(last accessed September 4, 2026).

[3] *See* Notice of Data Incident attached hereto as Exhibit A.

> to redirect the provider's payments, the unauthorized individual was able to download documents that included certain hospital claims and patient information.
>
> **What Information Was Involved**
>
> This incident did not involve access to your electronic health record, Social Security number, or financial account information, as that information is not available in the system that was involved in this incident. The Data Breach also did not involve government-issued identification numbers, dates of birth, laboratory test results, or medical testing information. The unauthorized individual's activity appeared to be financially motivated, rather than directed at obtaining patient data. Nevertheless, the unauthorized individual gained access to certain claims and payment information. This information included: your full name; identification numbers associated with your provider health care account or Medicaid claims; dates of medical services; information about the services you received and how they were billed; payment information, including amounts paid; and information about applicable non-Medicaid health insurance, including policy and group number.
>
> **What We Are Doing** Upon becoming aware of this activity, Gainwell Technologies took steps to secure the provider portal and enhance the overall security of the provider portal. Our external cybersecurity experts have validated that the activity was successfully contained, and the unauthorized individual no longer has access to the portal.

31. Despite Defendant's intentional opacity about the root cause of this incident, several facts may be gleaned from the Notice Letter, including: a) that this Data Breach was the work of cybercriminals; b) that the cybercriminals first infiltrated the HUSKY provider portal, and downloaded data from the networks and systems (aka exfiltrated data, or in layperson's terms "stole" data); and c) that once inside Defendant's networks and systems, the cybercriminals targeted information including Plaintiff's and Class Members' Private Information and other sensitive information for download and theft.

32. Moreover, in its Notice Letter, Defendant failed to specify whether it undertook any efforts to contact the Class Members whose data was accessed and acquired in the Data Breach to inquire whether any of the Class Members suffered misuse of their data, whether Class Members should report their misuse to Defendant, and whether Defendant set up any mechanism for Class Members to report any misuse of their data.

33. Due to Defendant's inadequate security measures, Plaintiff and the Class Members now face a present, immediate, and ongoing risk of fraud and identity theft and must deal with that threat forever.

34. Upon information and belief, the Private Information was not encrypted prior to the Data Breach.

35. Upon information and belief, the cyberattack was targeted at Defendant as a company that collects and maintains valuable personal data from many individuals, including Plaintiff and Class Members.

36. Upon information and belief, the cyberattack was expressly designed to gain access to private and confidential data, including (among other things) the Private Information of Plaintiff and Class Members.

37. Defendant had obligations to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

38. Plaintiff and Class Members indirectly provided their Private Information to Defendant, with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

## C. The Data Breach Was a Foreseeable Risk of Which Defendant Was on Notice.

39. It is well known that Private Information is an invaluable commodity and a frequent target of hackers.

40. Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting institutions that collect and

store Private Information, like Defendant, preceding the date of the Data Breach.

41. Cyberattacks on medical systems and on businesses that collect, store, or administer healthcare information have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive... because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[4]

42. In 2023, a record 3,205 data breaches occurred in the United States, resulting in about 349,221,481 sensitive records being exposed, a greater than 100% increase from 2019.[5] These statistics have held steady for 2024 – when 3,158 data compromises occurred. [6]

43. Entities possessing PHI, including business associates like Defendant, reported the largest number of data breaches among all measured sectors in 2022, with the highest rate of exposure per breach.[7] Indeed, when compromised, healthcare-related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[8] Almost 50% of the victims lost their healthcare coverage as a result of

---

[4] Ben Kochman, FBI, Secret Service Warn Of Targeted Ransomware, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited Sept. 4, 2026).

[5] ITRC (Identity Theft Resource Center), *2023 Data Breach Report* (January 2024), *available at* https://www.idtheftcenter.org/post/2023-annual-data-breach-report-reveals-record-number-of-compromises-72-percent-increase-over-previous-high/ (last visited Sept. 4, 2026).

[6] ITRC (Identity Theft Resource Center), *2024 Data Breach Report* (January 2025), *available at* https://www.idtheftcenter.org/publication/2024-data-breach-report/ (last visited Sept. 4, 2026).

[7] *See* Identity Theft Resource Center, 2022 Annual Data Breach Report, https://www.idtheftcenter.org/publication/2022-data-breach-report/ (last visited Sept. 4, 2026).

[8] *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET, March 3, 2010, available at https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/.

the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the patients were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[9]

44. Individuals place a high value not only on their Private Information, but also on the privacy of that data. For the individual, identity theft causes significant negative financial impact on victims as well as severe distress and other strong emotions and physical reactions.

45. In light of recent high profile data breaches at other industry leading companies, including, Change Healthcare Inc. (145 million records, February 2024), Kaiser Foundation Health Plan, Inc. (13 million records, April 2024), Ascension Health (5.6 million records, May 2024), HealthEquity, Inc. (4.3 million records, March 2024), and Acadian Ambulance Service, Inc. (2.8 million records, June 2024), Defendant knew or should have known that electronic records containing PHI would be targeted by cybercriminals.

46. Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

47. Additionally, as companies became more dependent on computer systems to run their business, *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.

48. The healthcare industry has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now

---

[9] *Id.*

the biggest target for online attacks."[10]

49. PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

50. As indicated by Jim Trainor, second in command at the FBI's cybersecurity division, medical records are valuable to criminals because they can combine a patient's name, health insurance information, and information about medical services and billing in one place. PHI records may sell for substantially more than ordinary consumer data on illicit markets.[11] A complete identity theft kit with health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[12]

51. As an entity in possession of a significant volume of Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information it collected and maintained in its possession and on its portal, and of the foreseeable consequences if its systems were breached. Such consequences include the significant costs imposed on Plaintiff and Class Members due to a breach. Nevertheless, Defendant failed to implement or follow reasonable cybersecurity measures to safeguard against the foreseeable threat of the Data Breach.

52. At all relevant times, Defendant knew, or reasonably should have known, of the

[10] 9 Reasons why Healthcare is the Biggest Target for Cyberattacks, Swivelsecure, https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/.
[11] You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows, IDExperts, May 14, 2015, https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-data.
[12] PriceWaterhouseCoopers, *Managing cyber risks in an interconnected world*, Sept. 40, 2014, available at https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf.

importance of safeguarding the Private Information of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

53. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

54. Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgment of its duties to keep the Private Information private and secure in its extensive Privacy Policies, Defendant failed to take appropriate steps to protect the Private Information of Plaintiff and the proposed Class from being compromised.

**D. Defendant Could Have Prevented the Data Breach.**

55. Data breaches are preventable.[13] "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[14] "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[15]

56. Most reported data breaches "are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. . . . Appropriate information security

---

[13] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thomson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088.
[14] *Id.* at 17.
[15] *Id.* at 28.

controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[16]

57. Here, many failures laid the groundwork for the Data Breach.

58. The Federal Trade Commission ("FTC") has published guidelines that establish reasonable data security practices for businesses.[17]

59. The FTC guidelines emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[18]

60. The FTC guidelines establish that businesses should protect the confidential information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems.[19]

61. The FTC guidelines also recommend that businesses utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[20]

62. According to information and belief, Defendant failed to follow reasonable and necessary industry standards to prevent a data breach, including the FTC's guidelines.

63. Defendant was at all times fully aware of its obligation to protect the Private Information of consumers under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45

---

[16] *Id.*
[17] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.
[18] *Id.*
[19] *Id.*
[20] *Id.*

("FTC Act"), yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored, and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

64. Upon information and belief, Defendant also failed to meet the minimum standards of recognized cybersecurity frameworks, including the NIST Cybersecurity Framework, NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well-respected authorities in cybersecurity readiness.

65. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[21]

66. To prevent and detect unauthorized access to the provider portal, Defendant could and should have taken, as recommended by the Federal Bureau of Investigation, the following measures:

- Implemented an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.
- Enabled strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and

[21] *See How to Protect Your Networks from RANSOMWARE*, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view. (last visited Aug. 17, 2026)

Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scanned all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
- Configured firewalls to block access to known malicious IP addresses.
- Patched operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Set anti-virus and anti-malware programs to conduct regular scans automatically.
- Managed the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.
- Configured access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.
- Disabled macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.
- Implemented Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or

compression/decompression programs, including the AppData/LocalAppData folder.

- Considered disabling Remote Desktop protocol (RDP) if it is not being used.
- Used application whitelisting, which only allows systems to execute programs known and permitted by security policy.
- Executed operating system environments or specific programs in a virtualized environment.
- Categorized data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[22]

67. According to information and belief, Defendant failed to do any of the above.

68. To prevent and detect cyberattacks, Defendant could and should have implemented measures recommended by the United States Cybersecurity & Infrastructure Security Agency, including the following:

- **Updated and patched your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks.
- **Used caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious

[22] *Id.* at 3–4.

website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net).

- **Opened email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.
- **Kept your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it.
- **Verified email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.
- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.
- **Used and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic.[23]

[23] *See Protecting Against Ransomware*, CYBERSECURITY & INFRASTRUCTURE SECURITY AGENCY (revised Sept. 2, 2021), https://www.cisa.gov/news-events/news/protecting-against-ransomware (internal citations omitted).

69. In addition, to prevent and detect cyberattacks to the provider portal and improper downloading of data, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Harden internet-facing assets**
  - Apply latest security updates
  - Use threat and vulnerability management
  - Perform regular audits
- **Thoroughly investigate and remediate alerts.**
  - Prioritize and treat commodity malware infections as potential full compromise of the system
- **Include IT professionals in security discussions.**
  - Ensure collaboration among security operations, security administrators, and information technology administrators to configure servers and other endpoints securely
- **Build and maintain credential hygiene**
  - Use multifactor authentication or network level authentication and enforce strong, randomized, just-in-time local administrator passwords
- **Apply principle of least-privilege**
  - Monitor for adversarial activities
  - Hunt for brute force attempts
  - Monitor for cleanup of Event Logs
  - Analyze logon events

- **Harden infrastructure**
    - Utilize Windows Defender Firewall
    - Enable tamper protection
    - Enable cloud-delivered protection
    - Turn on attack surface reduction rules and Antimalware Scan Interface for Office Visual Basic for Applications[24]

70. Specifically, among other failures, Defendant had far too much confidential unencrypted information held on its systems. Such Private Information should have been segregated into an encrypted and appropriately protected system.[25]

71. Given that Defendant was storing the Private Information of a significant number of individuals, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks. However, Defendant failed to do so.

72. Moreover, it is well-established industry standard practice for a business to dispose of confidential Private Information once it is no longer needed.[26]

73. The FTC has repeatedly emphasized the importance of disposing of unnecessary Private Information: "Keep sensitive data in your system only as long as you have a business reason to have it. Once that business need is over, properly dispose of it. If it's not on your system,

---

[24] *See Human-operated ransomware attacks: A preventable disaster*, MICROSOFT THREAT INTELLIGENCE (Mar 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/. (last visited Aug. 17, 2026)

[25] *See* Adnan Raja, *How to Safeguard Your Business Data With Encryption*, DATAINSIDER (Aug. 14, 2018), https://digitalguardian.com/blog/how-safeguard-your-business-data-encryption. (last visited Aug. 17, 2026)

[26] *See Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

it can't be stolen by hackers."[27] Rather than following this basic standard of care, Defendant kept individuals' unencrypted Private Information on its inadequately secured systems for longer than necessary.

74. In sum, the Data Breach could have been easily prevented through standard practices like the use of industry standard network segmentation, redaction, and encryption of all Private Information—which, upon information and belief, Defendant negligently failed to do.

75. Further, the scope of the Data Breach could have been dramatically reduced had Defendant utilized proper record retention and destruction practices—but Defendant negligently did no such thing.

**E. Defendant was Required, But Failed to Comply with HIPAA.**

76. Defendant is a "business associate" under HIPAA (45 C.F.R. § 160.103). In its role as fiscal agent, account administrator, and portal operator, Defendant creates, receives, maintains, or transmits PHI on behalf of its Clients and is subject to the HIPAA Security Rule and applicable Privacy Rule provisions.

77. Defendant is further subject to the Health Information Technology for Economic and Clinical Health Act ("HITECH")'s rules for safeguarding electronic forms of medical information. HITECH extended direct liability to business associates for specified HIPAA requirements, including Security Rule obligations. *See* 42 U.S.C. § 17934; 45 C.F.R. § 160.103.

78. HIPAA's Security Rule, titled *Security Standards for the Protection of Electronic Protected Health Information,* establishes a national set of security standards for protecting PHI that is kept or transferred in electronic form.

[27] *Id.* at 6.

79. HIPAA requires Defendant, as a business associate, to "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

80. HIPAA's Security Rule required and requires that Defendant, as a business associate, do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information that Defendant creates, receives, maintains, or transmits on behalf of DSS;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.

81. HIPAA also requires Defendant, as a business associate, to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

82. HIPAA and HITECH also require business associates to implement policies and procedures to prevent, detect, contain, and correct data security violations and unauthorized disclosures of PHI that are reasonably anticipated but not permitted by applicable privacy rules. *See* 45 C.F.R. § 164.306(a)(1), (a)(3).

83. HIPAA further requires Defendant, as a business associate, to apply appropriate sanctions against members of its workforce who fail to comply with applicable privacy and security policies and procedures or the requirements of 45 C.F.R. Part 164. *See* 45 C.F.R. § 164.308(a)(1)(ii)(C).

84. HIPAA further requires covered entities and business associates to mitigate, to the extent practicable, any harmful effect known to them of a use or disclosure of PHI in violation of applicable policies and procedures or the requirements of 45 C.F.R. Part 164. As a business associate, Defendant was required to take practicable steps to mitigate known harmful effects and to cooperate with DSS in doing so. *See* 45 C.F.R. §§ 164.504(e), 164.530(f).

85. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities and business associates in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[28] The list of resources includes a link to guidelines set by the

[28] https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited Aug. 17, 2026).

National Institute of Standards and Technology, which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[29]

86. As alleged in this Complaint, Defendant failed to comply with applicable HIPAA and HITECH obligations as a business associate. It failed to maintain adequate security practices, systems, and protocols to prevent cyberattacks and downloading, failed to mitigate the risks of a data breach, and failed to ensure the confidentiality and protection of Plaintiff's and Class Members' Private Information, including PHI.

**F. Defendant Had a Duty to Plaintiff and Class Members to Secure Private Information.**

87. At all relevant times, Defendant owed a duty of care to Plaintiff and Class Members to properly secure their Private Information, protect their Private Information from unauthorized disclosure, encrypt and maintain such information using industry standard methods, train its employees, utilize available technology to defend its systems from invasion, and act reasonably to prevent foreseeable harm to Plaintiff and Class Members.

88. Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between Defendant, on the one hand, and Plaintiff and the Class Members, on the other hand. The special relationship arose because Plaintiff and Class Members relied on Defendant to secure their Private Information when they entrusted Defendant or Defendant's Clients with the Private Information and when the Clients in turn entrusted the Private Information to Defendant.

89. Defendant had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite its obligation to protect such information.

[29] *Id.*

Accordingly, Defendant breached its common law, statutory, and other duties owed to Plaintiff and Class Members.

90. Security standards commonly accepted among businesses that store Private Information using the internet include, without limitation:

a. Maintaining a secure firewall configuration;

b. Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

c. Monitoring for suspicious or irregular traffic to servers;

d. Monitoring for suspicious credentials used to access servers;

e. Monitoring for suspicious or irregular activity by known users;

f. Monitoring for suspicious or unknown users;

g. Monitoring for suspicious or irregular server requests;

h. Monitoring for server requests for Private Information;

i. Monitoring for server requests from VPNs; and

j. Monitoring for server requests from Tor exit nodes.

91. The ramifications of Defendant's failure to keep Private Information secure are long lasting and severe. Once Private Information is stolen, particularly PHI, claims information, and health insurance information, fraudulent use of that information and damage to victims is likely to continue for years.

**G. The Value of Personally Identifiable Information.**

92. The Private Information of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web

pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200. [30]

93. As a growing number of federal courts have begun to recognize the loss of value of Private Information as a viable damages theory, the sale of Private Information from data breaches, as in the Data Breach alleged herein, is particularly harmful to data breach victims – especially when it takes place on the dark web.

94. The dark net is an unindexed layer of the internet that requires special software or authentication to access.[31] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[32] This prevents dark web marketplaces from being easily identifiable to authorities or those not in the know.

95. A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, sensitive personal information like the Private Information at issue here.[33] The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand

---

[30] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Sept. 4, 2026).
[31] *What Is the Dark Web?,* Experian, *available at* https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited Sept. 4, 2026).
[32] *Id.*
[33] *What is the Dark Web?* – Microsoft 365, *available at* https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last visited Aug. 17, 2026).

requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth and other personal information.[34] As Microsoft warns, "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[35]

96. Plaintiff's and Class Members' Private Information is a valuable commodity, a market exists for Plaintiff's and Class Members' Private Information (which is why the Data Breach was perpetrated in the first place), and Plaintiff's and Class Members' Private Information is likely being sold by hackers on the dark web (as that is the *modus operandi* of data thieves) – as a result, Plaintiff and Class Members have lost the value of their Private Information, which is sufficient to plausibly allege injury arising from a data breach.

97. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[36] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[37] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60.00 a year.[38]

---

[34] *Id.*; *What Is the Dark Web?,* Experian, *available at* https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited Aug. 17, 2026).
[35] *What is the Dark Web?* – Microsoft 365, *available at* https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last visited Aug. 17, 2026).
[36] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Sept. 4, 2026).
[37] https://datacoup.com/ (last visited Sept. 4, 2026).
[38] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Sept. 4, 2026).

98. The Private Information stolen in this specific Data Breach was particularly harmful.

99. Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[39]

100. The electronic administration of Medicaid claims and payment information creates risks of privacy breaches. Such data can contain patient names, dates of medical services, information about services received and how they were billed, and health insurance information that is valuable to cybercriminals. As such, companies like Defendant that create, receive, maintain, or transmit PHI for a covered entity face heightened risk and must use appropriate safeguards.

101. Indeed, during 2019 alone, over 41 million healthcare records were exposed, stolen, or unlawfully disclosed in 505 data breaches.[40] In short, these sorts of data breaches targeting PHI are increasingly common.

102. According to account monitoring company LogDog, medical data sells for $50 and up on the Dark Web.

103. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy

[39] *Medical I.D. Theft*, EFraudPrevention https://efraudprevention.net/home/education/?a=187#:~:text=A%20thief%20may%20use%20your,credit%20report%20may%20be%20affected. (last visited Sept. 4, 2026)

[40] https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/ (last visited Sept. 4, 2026).

Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[41]

104. A study by Experian found that the average cost of medical identity theft is "about $20,000" per incident and that most victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive to restore coverage.[42] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third of medical identity theft victims saw their insurance premiums rise, and 40 percent were never able to resolve their identity theft at all.[43]

105. Private Information can be used to distinguish, identify, or trace an individual's identity, such as their full name and identification numbers associated with a provider health care account or Medicaid claims. This can be accomplished alone, or in combination with information linked to an individual, such as dates of medical services, information about services received and how they were billed, and policy and group numbers for applicable non-Medicaid health insurance.[44]

106. Given the nature of Defendant's Data Breach, it is foreseeable that the compromised Private Information has been or will be used by unauthorized third parties in a variety of harmful ways, including medical identity theft, fraudulent insurance claims, billing fraud, phishing, and social engineering. Unauthorized third parties who possess Plaintiff's and

---

[41] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/ (last visited Sept. 4, 2026).

[42] *See* Elinor Mills, "Study: Medical Identity Theft is Costly for Victims," CNET (Mar, 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last visited Sept. 4, 2026).

[43] *Id.; see also Healthcare Data Breach: What to Know About them and What to Do After One,* EXPERIAN, https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last visited Sept. 4, 2026)

[44] *See* OFFICE OF MGMT. & BUDGET, OMB MEMORANDUM M-07-16 n. 1.

Class Members' Private Information can use it to target them with fraudulent healthcare or insurance activity.

107. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures.

**H. The Harm Caused by the Data Breach Now and Going Forward.**

108. Victims of data breaches are susceptible to becoming victims of identity theft for years to come. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201(9).

109. The type of data that may have been accessed and compromised here can be used to perpetrate fraud and identity theft and Plaintiff and Class Members face a substantial risk of identity theft given that their Private Information was compromised in the Data Breach.

110. When malicious actors infiltrate companies and copy and exfiltrate the Private Information that those companies store, the stolen information often ends up on the dark web, where malicious actors buy and sell that information for profit.[45]

111. For example, when the U.S. Department of Justice announced its seizure of AlphaBay—the largest online "dark market"—in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity.[46] Marketplaces similar to the now-defunct AlphaBay continue to be "awash with [Private Information] belonging to victims from countries all over the world."[47]

---

[45] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Dec. 28, 2020) https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last visited Sept. 4, 2026).
[46] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018) https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (last visited Sept. 4, 2026).
[47] *Id.*

112. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft-related crimes discussed below.

113. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

114. For example, armed with just a full name and details about medical services or health-insurance coverage, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as login credentials or other confidential information. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches can be the starting point for these additional targeted attacks on the victim.

115. One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[48]

---

[48]"Fullz" is fraudster speak for data that includes information about a victim, including, but not limited to, the name, address, health-insurance information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be used for numerous purposes, including fraudulent insurance or benefits claims and other schemes. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on

116. With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

117. The development of "Fullz" packages means here that the Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information, such as emails or phone numbers, may not be included in the Private Information stolen in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

**I. Loss of Time to Mitigate the Risk of Identity Theft and Fraud**

118. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the resource and asset of time has been lost.

119. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result

---

Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/ (last visited Sept. 4, 2026).

of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and reviewing health-insurance records for fraudulent claims or other unauthorized activity, which may take years to detect.

120. These efforts are consistent with the U.S. Government Accountability Office, which released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[49]

121. These efforts are also consistent with the steps that FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[50]

**J. Diminution of Value of Private Information**

122. Private Information is a valuable property right.[51] The value is axiomatic, considering the value of Big Data in corporate America, and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates beyond a

---

[49] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf. (last visited Sept. 4, 2026).

[50] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps. (last visited Aug. 17, 2026).

[51] *See, e.g.*, Randall T. Soma, et al., Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

doubt that Private Information has considerable market value.

123. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

124. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

125. As a result of the Data Breach, the Private Information of Plaintiff and Class Members has been exposed to criminals for misuse. The injuries suffered by Plaintiff and Class Members, or likely to be suffered as a direct result of Defendant's Data Breach, include: (a) theft of their Private Information; (b) costs associated with the detection and prevention of identity theft; (c) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the consequences of this Breach; (d) invasion of privacy; (e) the emotional distress, stress, nuisance, and annoyance of responding to, and resulting from, the Data Breach; (f) the actual and/or imminent injury arising from actual and/or potential fraud and identity theft resulting from their Private Information being placed in the hands of ill-intentioned hackers and/or criminals; (g) damage to and diminution in value of their Private Information entrusted to Defendant with the mutual understanding that Defendant would safeguard

it against cyberattacks and misuse; and (h) the continued risk to their Private Information, which remains in the possession of Defendant and is subject to further injurious breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

**K. Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary**

126. In addition to a remedy for economic harm, Plaintiff and Class Members maintain an interest in ensuring that their Private Information is secure, remains secure, and is not subject to further misappropriation and theft.

127. Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes.

128. Such fraud may go undetected for years; consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

129. As a result, Plaintiff and Class Members also request relief in the form of the future cost of credit and identity theft monitoring, which is reasonable and necessary. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from the Data Breach.

## PLAINTIFF'S EXPERIENCES AND INJURIES

***Plaintiff's Experiences***

130. Plaintiff is a member of Connecticut's Medicaid program, HUSKY Health, which

is administered by DSS. Defendant serves as fiscal agent,account administrator, and the portal operator for HUSKY Health.

131. In connection with the services Defendant provides to HUSKY Health, Defendant collected and maintained Plaintiff's Private Information.

132. At all times relevant, Defendant maintained Plaintiff's Private Information on its systems and on the portal it maintained.

133. Plaintiff received a Notice Letter directly from Defendant, dated August 21, 2026. According to the Notice Letter, Plaintiff's Private Information was improperly accessed and obtained by unauthorized third parties in Defendant's Data Breach.

134. Plaintiff is very careful about sharing her sensitive Private Information. Plaintiff stores any documents containing her Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted her Private Information to Defendant's Clients had she known of Defendant's lax data security policies.

135. As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate its impact, including researching and verifying the legitimacy of the Data Breach, reviewing credit reports, and reviewing health-insurance records for unauthorized claims or activity. Plaintiff has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

136. Plaintiff will continue to spend considerable time and effort monitoring her accounts and health-insurance records to protect herself from identity theft and fraudulent claims. Plaintiff fears for her personal and medical-insurance security and uncertainty over what Private

Information was exposed. Plaintiff has and is experiencing feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

137. Plaintiff is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties. This injury is worsened by Defendant's failure to promptly inform Plaintiff about the Data Breach.

138. Once an individual's Private Information is for sale or accessible on the dark web, unauthorized third parties can use the stolen and compromised information to gather and obtain even more information. Plaintiff's Private Information was compromised as a result of the Data Breach.

139. Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

140. Plaintiff also has a continuing interest in lifetime credit monitoring and identity theft monitoring on account of the Data Breach.

## CLASS ALLEGATIONS

141. Plaintiff brings this class action, individually and on behalf of the following Class under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3):

**Nationwide Class**
All persons in the United States whose Private Information was compromised as a result of the Data Breach, including all individuals who were sent a Notice Letter (the "Class").

142. Specifically excluded from the Class are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, principals, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

143. Plaintiff reserves the right to amend the Class definitions above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

144. This action may be certified as a class action because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

145. Numerosity: The Class is so numerous that joinder of all Class Members is impracticable. Although the precise number of such persons is unknown, and the facts are presently within the sole knowledge of Defendant, upon information and belief, at least 41,000 individuals were affected[52]. The Class is sufficiently numerous to warrant certification.

146. Typicality of Claims: Plaintiff's claims are typical of those of other Class Members because Plaintiff, like the unnamed Class, had her Private Information compromised because of the Data Breach. Plaintiff is a member of the Class, and her claims are typical of the claims of the members of the Class. The harms suffered by Plaintiff are similar to those suffered by all other Class Members, which were caused by the same misconduct by Defendant.

---

[52] https://portal.ct.gov/dss/press-room/press-releases/ct-dss-and-gainwell-technologies-announces-security-incident-affecting-provider-portal?language=en_US(last accessed Sept. 4, 2026)

147. Adequacy of Representation: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has no interests antagonistic to, or in conflict with, the Class. Plaintiff has retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

148. Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

149. Commonality and Predominance: Defendant engaged in a common course of conduct toward Plaintiff and Class Members, in that Plaintiff's and Class Members' Private Information was stored on the same portal and unlawfully accessed the same way. There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

a) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

b) Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

c) Whether Defendant's storage of Plaintiff's and Class Members' Private Information was done in a negligent manner;

d) Whether Defendant had a duty to protect and safeguard Plaintiff's and Class Members' Private Information;

e) Whether Defendant's conduct was negligent;

f) Whether Defendant's conduct violated Plaintiff's and Class Members' privacy;

g) Whether Defendant took sufficient steps to secure individuals' Private Information; and

h) The nature of relief, including damages, to which Plaintiff and Class Members are entitled.

150. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

151. <u>Manageability:</u> The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

152. <u>Ascertainability</u>: Adequate notice can be given to Class Members directly using information maintained in Defendant's records. Indeed, Defendant has already begun sending Notice of Data Incident letters to victims of the Data Breach.

153. <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards

of conduct toward the Class Members and making final injunctive relief and corresponding declaratory relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

154. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses, as evidenced by the fact that Defendant has sent individualized Notice Letter to victims of the Data Breach.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE AND NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Class)

155. Plaintiff restates and realleges paragraphs 1 through 154 as if fully set forth herein.

156. Defendant knowingly collected the Private Information of Plaintiff and Class Members in connection with the services Defendant provides, and stored and maintained the Private Information on inadequately secured systems and networks.

157. Upon accepting and storing Plaintiff's and Class Members' Private Information on their computer systems and networks, Defendant undertook and owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information from unauthorized access and disclosure.

158. Defendant had full knowledge of the sensitivity of the Private Information in its possession and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information was wrongfully accessed or disclosed. Plaintiff and Class Members were therefore the foreseeable victims of any inadequate data security practices.

159. Defendant owed a duty to exercise reasonable care in designing, implementing, maintaining, monitoring, and testing its networks, systems, protocols, policies, procedures and practices to ensure that Plaintiff's and Class Members' Private Information was adequately secured from impermissible release, disclosure, and publication.

160. Defendant owed a duty of care to Plaintiff and Class Members to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure, to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its computer systems and networks, and the personnel responsible for them, adequately protected the Private Information.

161. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems and the portal it operated in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

162. Defendant owed Plaintiff and Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiff and the Class when obtaining, storing, using, and managing their Private Information, including taking action to reasonably safeguard or delete such data and providing notification to Plaintiff and Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

163. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards, applicable standards of care from statutory authority like Section 5 of the FTC Act and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected individuals' Private Information.

164. Defendant had a duty to implement and maintain reasonable data security practices pursuant to Section 5 of the FTC Act, 15 U.S.C. § 45(a), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect sensitive and confidential data.

165. The FTC Act prohibits "unfair practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also formed part of the basis of Defendant's duty in this regard.

166. Defendant likewise failed to comply with applicable HIPAA and HITECH requirements by failing to prevent the exfiltration of Plaintiff's and Class Members' PHI in the Data Breach.

167. Defendant was in a superior position to ensure its data security practices were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a data breach.

168. Defendant knew Plaintiff and Class Members relied on it to protect their Private Information. Plaintiff and Class Members were not in a position to assess the data security practices used by Defendant. Because they had no means to identify Defendant's security deficiencies, Plaintiff and Class Members had no opportunity to safeguard their Private Information from cybercriminals. Defendant exercised exclusive control over the Private Information stored on its systems and networks; accordingly, Defendant was best positioned and most capable of preventing the harms caused by the Data Breach.

169. Defendant's duties extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the

actor's own conduct or misconduct exposes another to such risk, or defeats protections put in place to guard against that risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B.

170. Defendant was aware, or should have been aware, of the fact that cybercriminals routinely target entities storing Private Information through cyberattacks in an attempt to steal valuable Private Information. In other words, Defendant knew of a foreseeable risk to its data security systems but failed to implement reasonable security measures.

171. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information.

172. The specific negligent acts and omissions committed by Defendant include, but are not limited to:

a) Failing to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure;

b) Failing to adopt, implement, and maintain adequate data security measures to safeguard Plaintiff's and Class Members' Private Information;

c) Failing to adequately monitor the security of its networks and systems to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information;

d) Failing to ensure its systems had plans in place to maintain reasonable data security safeguards;

e) Failing to implement and maintain adequate mitigation policies and procedures;

f) Allowing unauthorized access to Plaintiff's and Class Members' Private Information;

g) Failing to detect in a timely manner that Plaintiff's and Class Members' Private Information had been compromised; and

h) Failing to timely notify Plaintiff and Class Members about the Data Breach so they could take appropriate steps to mitigate the potential for identity theft and other damages.

173. Defendant's negligent conduct demonstrated a substantial lack of concern for whether injury would result to Plaintiff and the Class. Defendant's actions and omissions constituted a reckless indifference to the rights, safety, and interests of Plaintiff and the Class, whose sensitive personal and medical information Defendant was entrusted to protect.

174. The fact that usable Private Information was accessed and obtained in the Data Breach demonstrates that the Private Information contained in the infiltrated network was not encrypted. Had the information been properly encrypted, the data thieves would have accessed only indecipherable data. This Data Breach could have been prevented through industry standard network segmentation and encryption of confidential information. Further, the Data Breach could have likely been prevented had Defendant utilized appropriate malware prevention and detection technologies.

175. Defendant acted negligently by ignoring its duty—in spite of its knowledge of the ubiquity of data breaches—to ensure its own network and systems had adequate security safeguards to protect Plaintiff's and Class Members' Private Information and to ensure processes were sufficient to detect unauthorized access to its network or compromises of Private Information stored therein.

176. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

177. Defendant violated the FTC Act and HIPAA by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information and by failing to comply with applicable industry standards, as described herein.

178. Defendant breached its duties to Plaintiff and the Class under the FTC Act and HIPAA by failing to implement and maintain fair, reasonable, and adequate data security practices to safeguard Plaintiff's and Class Members' Private Information.

179. Plaintiff and the Class are within the class of persons the FTC Act and HIPAA intended to protect.

180. As a direct and proximate result of Defendant's negligent conduct, including, but not limited to, its knowing failure to implement and maintain reasonable data security practices and procedures as described above, Plaintiff and the Class have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

181. Moreover, as a result of Defendant's negligence in safeguarding Plaintiff's and Class Members' Private Information, Plaintiff and Class Members will have to spend money for future costs of credit monitoring and theft protection which are reasonably necessary given the type of highly sensitive data stolen in the Data Breach.

182. Through Defendant's acts and omissions described herein, including but not limited to Defendant's failure to protect the Private Information of Plaintiff and Class Members from being stolen and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure the Private Information of Plaintiff and Class Members while it was within Defendant's possession and control.

183. As a direct and proximate result of Defendant's conduct, including, but not limited to, Defendant's failure to implement and maintain reasonable data security practices and

procedures, Plaintiff and Class Members have suffered or will suffer injury and damages, including, but not limited to: (i) the loss of the opportunity to determine for themselves how their Private Information is used; (ii) the publication and theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their Private Information, including the need for substantial credit monitoring and identity protection services for an extended period of time; (iv) lost time and opportunity costs associated with efforts expended to address and mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest and recover from fraud and identity theft; (v) costs associated with placing freezes on credit reports and password protections; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives. Thus, Plaintiff and the Class are entitled to damages in an amount to be proven at trial.

184. As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, damages arising from the Data Breach, as alleged above.

185. The damages Plaintiff and the Class have suffered and will suffer (as alleged above) were and are the direct and proximate result of Defendant's grossly negligent conduct.

186. Plaintiff and the Class have suffered cognizable injuries and are entitled to actual and punitive damages in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**BREACH OF THIRD PARTY BENEFICIARY CONTRACT**
**(On Behalf of Plaintiff and the Class)**

187. Plaintiff restates and realleges paragraphs 1 through 154 as if fully set forth herein.

188. Upon information and belief, Defendant entered into contracts, written or implied, with its Clients that contracted with Defendant in connection with the services Defendant provides. Upon information and belief, these contracts are virtually identical between and among Defendant and its Clients around the country.

189. In exchange, Defendant agreed, in part, to implement adequate security measures to safeguard the Private Information of Plaintiff and the Class.

190. These contracts were made expressly for the benefit of Plaintiff and the Class, as Plaintiff and Class Members were the intended third-party beneficiaries of the contracts entered into between Defendant and its Clients. Defendant knew that if it were to breach these contracts with its Clients, Plaintiff and Class Members would be harmed.

191. Defendant breached the contracts it entered into with its Clients by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure to third parties, and (iii) promptly and adequately detect the Data Breach.

192. Plaintiff and the Class were harmed by Defendant's breach of its contracts with its Clients, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

193. Plaintiff and Class Members are also entitled to their costs and attorneys' fees incurred in this action.

**THIRD CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

194. Plaintiff restates and realleges paragraphs 1 through 154 as if fully set forth herein.

195. This Count is pleaded in the alternative to Plaintiff's Breach of Third-Party Beneficiary Contract claim.

196. Plaintiff and Class Members conferred a benefit on Defendant by indirectly providing their Private Information to Defendant. Defendant accepted and appreciated that benefit.

197. Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including from payments made indirectly to it by Plaintiff and Class Members.

198. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant calculated to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures.

199. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information.

200. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

201. Under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary value of the benefit belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

202. Defendant acquired the monetary benefit and Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

203. If Plaintiff and Class Members knew that Defendant had not adequately secured their Private Information, they would not have indirectly provided their Private Information to Defendant.

204. Plaintiff and Class Members have no adequate remedy at law.

205. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered or will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) potential dissemination of their Private Information on the dark web; (ix) statutory damages; (x) nominal damages; and (xi) the continued and certainly increased risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

206. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

207. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for judgment as follows:

A. An Order certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing her counsel to represent the Class;

B. Judgment in favor of Plaintiff and the Class on all counts asserted herein;

C. Awards of damages in amounts to be determined at trial;

D. An award of statutory damages or penalties to the extent available;

E. An award of attorneys' fees and costs, as allowed by law;

F. An award of pre- and post-judgment interest, as provided by law; and

G. Such further relief to which Plaintiff and the Class are entitled.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 4, 2026

Respectfully submitted,

*/s/ Leanna Loginov*

Leanna A. Loginov
**SHAMIS & GENTILE, P.A.**
2626 Cole Avenue, Suite 300
Dallas, Texas 75204
Tel: (305) 479-2299
E: lloginov@shamisgentile.com

***Counsel for Plaintiff and the Proposed Class***